# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 3:14-00103** |
| | ) | **JUDGE SHARP** |
| | ) | |
| **MARTIN LEON-SANTOYO** | ) | |

## MEMORANDUM

Pending before the Court is Defendant Martin Leon-Santoyo's Motion to Suppress (Docket No. 19). After a hearing on the Motion, the parties were directed to file briefs, the last of which was received on December 12, 2014. For the reasons that follow, Defendant's Motion to Suppress will be granted.[1]

## I. FACTUAL FINDINGS[2]

In June 2014, the Rutherford County Sheriff's Department received information from a confidential source that a courier, traveling by bus, might be bringing drugs to Murfreesboro, Tennessee. Pursuant to a warrant, officers tracked a cell phone said to be carried by the courier. On June 3, 2014, the cell phone was located in Texarkana, Texas and, the following morning, was determined to be in or near Nashville, Tennessee.

---

[1] As a housekeeping matter, the Government's Motion to Strike Portions of Exhibit 1 (Docket No. 29) will be denied as moot. That Motion seeks to strike the third column of a transcription of one of the Defendant's interviews because it includes unsworn opinions. The Court does not rely on that column or the opinions in formulating this decision.

[2] The following findings are drawn from the testimony of the witnesses at the suppression hearing, after considering their interests and demeanor. These facts are also drawn from the exhibits received in the evidence, including audio and video recordings of Defendant's interactions with police officers on the day in question and translations of those recordings. Because these are the Court's findings, any contrary testimony on a specific matter has been rejected in favor of the specific fact found.

On June 4, 2014, surveillance was set up around the bus station in Murfreesboro, Tennessee. Detective William Holton, a member of the Sheriff's Department and Drug Enforcement Administration ("DEA") task force officer, was in charge of the case. Deputy Sheriff Bo Davis, a drug interdiction officer and canine handler, was assigned to make the initial contact with the suspect.

Deputy Davis pulled into the bus stop around 7:45 a.m. and saw a Greyhound bus leaving the lot. Three individuals disembarked from the bus, two of whom left immediately. The third was a middle-aged Hispanic male wearing a white cowboy hat who generally fit the description Deputy Davis had been given of the suspect. That individual is the Defendant herein.

Deputy Davis' interaction with the Defendant was captured on audio tape.[3] It is clear from that audio tape (and through later encounters) that Defendant's first language is Spanish and that he speaks and understands limited English.

Deputy Davis approached, greeted, and introduced himself to Defendant. Defendant told Deputy Davis that his name was Martin and, upon questioning, stated that he had been traveling for four days, and that he had traveled from Sacramento, California to Murfreesboro to work on a ranch. When Deputy Davis asked Defendant who was coming to pick him up, Defendant responded, "Uh, maybe family." When Deputy Davis observed that there were few ranches in the area and asked Defendant what type of ranch, Defendant stated, "I don't know."

Deputy Davis then told Defendant that he worked "criminal interdiction." In response to questioning, Defendant stated that he had never been arrested before and that there was no warrant

---

[3] While Deputy Davis' squad car is equipped with both video and audio recording devices, he parked in such a position that the video camera did fully not capture the interaction.

for his arrest.  When asked if he had "anything illegal" on him, Defendant stated no, and consented

to a search of his person.

Deputy Davis turned his attention to a duffel bag at Defendant's side.  The following

exchange then took place:

DEPUTY DAVIS:  What have you got there? Is that your bag there?
DEFENDANT:  Yeah it's mine.
DEPUTY DAVIS:  Can I search your bag?  Hey sir, can I, can I search your bag?
DEFENDANT:  Yeah it's mine.
DEPUTY DAVIS:  Can I search it?
DEFENDANT:  Yeah.
DEPUTY DAVIS:  I can?  Do you understand what I'm asking you?
DEFENDANT:  (Inaudible).
DEPUTY DAVIS:  Can I look, can I look through it?
DEFENDANT:  Yeah.
DEPUTY DAVIS:  Okay.
DEFENDANT:  No problem.
DEPUTY DAVIS: What all you got in here?
DEFENDANT:  Eh.
DEPUTY DAVIS: What all do you have you have in here?
DEFENDANT:  I have pictures of my (inaudible).
DEPUTY DAVIS:  Are you okay, you look like you're going to pass out man?
DEFENDANT:  Eh.
DEPUTY DAVIS: You look like you're going to pass out, are you okay?  Got some
pictures?
DEFENDANT:  Yeah.

(Docket No. 24-2 at 5-6).[4]

Inside the duffel bag, Deputy Davis found clothing, a pair of boots, and two pictures. In

halting English, Defendant explained that the pictures either were of his sister or going to his sister.

The pictures were in matching brown frames, one approximately 8" X 10," and the other

approximately 11" X 13."  Both were wrapped in cellophane.  Deputy Davis asked if he could

---

[4] The written transcript of the conversation identifies the participants as "Unknown Officer" and "Hispanic Male," but it is clear that the conversation was between Deputy Davis and Defendant.

unwrap the pictures and, while the audio recording is unclear, the Court credits Deputy Davis' testimony that Defendant consented to the request.

The pictures and frames aroused Deputy Davis's suspicion. Not only were they wrapped, the pictures were low quality and not under glass, while the frames were handmade and of nice quality. Further, the frames were very thick, and could have been hollowed out. He explained his suspicion to another officer who had arrived on scene by stating:

> DEPUTY DAVIS: No, he's got two picture frames that were wrapped in cellophane and it, it, the only thing I'm thinking is its built into the um, built into the picture frames. But I mean, when I asked to search his bag he about passed out.
>
>          *                  *                  *
>
> Man he's got picture frames in there and they're wrapped in cellophane and that's it. I mean dude, when I asked for consent to search his bag, he gave it to me, but I mean he, I thought he was gonna pass out. Um, but those picture frames, unless it's built into the picture frames, but before I start prying that open, I'm gonna . . .

(Id. at 8).

Defendant was told that Deputy Davis's canine "alerted" to the picture frames and that the dog was "trained to alert on drugs like marijuana, cocaine, methamphetamine, and heroin." (Id. at 11). In response to the statements, Defendant responded "hum?" or "um". Id.

Given the canine's alert and Deputy Davis's suspicions,[5] it was decided that Defendant would be taken to the police station for further questioning. Just before the audio recording ends, an officer can be heard saying, "We're going to get a search warrant." (Id. at 12).[6]

Detective Holton testified that the information he had received from the confidential

---

[5] Deputy Davis testified that once his canine alerted to the frames, Defendant was not free to leave.

[6] At the evidentiary hearing, Deputy Davis testified that Detective Holton wanted to secure a search warrant before the picture frames were pried open. (Docket No. 37 at 35).

informant was that drugs might be secreted in children's books,[7] but, given the description of the frames, he thought drugs might be found there. He determined that Defendant should be taken to the Criminal Investigation Division at the Sheriff's Office and be interviewed by a Spanish speaking officer. If possible, officers were going to get consent to search the frames, otherwise a search warrant would be sought.

Defendant was transported from the bus station to the Sheriff's Department, a trip that lasted ten or fifteen minutes. Once at the station, Defendant was interviewed by Detective Holton. Also present was Agent Joe Ramirez, a member of the 17th Judicial District Drug Task Force, who had been with the confidential source when Defendant was approached at the bus stop.

Agent Ramirez served as a translator for the interview which was conducted in Spanish and video and audio recorded. Agent Ramirez grew up in a Spanish-speaking household, but his proficiency in that language was disputed by federally certified translators at the evidentiary hearing.

Michael Zogby, who testified on behalf of the Government, stated that Agent Ramirez did not have "the most correct accent in the world in Spanish," but was understandable. (Hrg. Tr. Vol. 2 at 17). He conceded, however, that there were some points where Agent Ramirez exhibited a limited Spanish vocabulary. Heather Hayes, who testified for the defense, was a lot less charitable, claiming that, while Agent Ramirez's Spanish was "not horrible generally," it was "kind of elementary school Spanish." (Id. at 34 & 42). The Court finds it unnecessary to comment on these opinions, other than to say that there was an evident failure to effectively communicate subtleties to Defendant, and a failure by Agent Ramirez to communicate to Detective Holton what Defendant

---

[7] Detective Holton claims that, after the fact, he learned the confidential source had indicated the drugs might be secreted in picture frames.

had actually said.

Returning to the narrative, the interview was held in a relatively small room with the participants within feet of each other.  Defendant, who was not handcuffed, sat at one end of the table while Agent Holton sat to his right.  Agent Ramirez was standing a few feet behind and to the right of Defendant.

The duffel bag was not in the room.  Rather, it was sitting just outside the room with the picture frames on top.

After initial introductions and shortly into the interview,  Defendant responded "no, no, no" when asked whether he understood English very well.  (Def. Exh. 1 at 2).  He gave the officers his name, date of birth, and informed them that he was from Mexico, specifically Morelia, Michoacàn.  Detective Holton told Agent Ramirez to advise Defendant of his rights and to ask him why the canine would alert on the bag.

Agent Ramirez read Defendant the <u>Miranda</u> warnings but bungled it a bit by stating that "the country" would provide an attorney if Defendant could not afford one.  At several points while the warnings were read, Defendant raised his index finger.  This may have been because he wanted to ask a question, or because he was acknowledging that he understood the statement.  It could have been a cultural thing (as Mr. Zogby suggest as a possibility), or an indication that the speaker should continue.  Or, it may have been for any number of other reasons.  Regardless, the repeated raising of the finger was not inquired into by either officer in the room.

When Agent Ramirez asked Defendant if he was willing to answer questions,  Defendant asked, "Can I call home for them to get me an attorney that I have?",  to which Agent Ramirez said, "yeah, sure, sure" he could call home or whoever he liked after they were finished. (<u>Id</u>. at 4).  When

Detective Holton asked Agent Ramirez what they were saying, Agent Ramirez stated, "He was asking if he can call home" and "I said as soon as we're done . . . he can make phone calls" and "call whoever he wants to call." (Id.). Agent Ramirez did not tell Detective Holton that Defendant had mentioned an attorney.[8]

Detective Holton instructed Agent Ramirez to explain to the Defendant that local police are kind of like "customs" and they sometimes ask that buses from another area be searched, and that a dog had alerted on the possibility of narcotics in Defendant's possession. Agent Ramirez's next interchange with Defendant is unintelligible, but he told Detective Holton that Defendant understood. When asked why the dog would have alerted on his bag, Defendant stated that he had packed his own bag, everything in the bag was his, he had no knowledge of any drugs in the bag or in its contents, and that he had not been near any drugs.

After Defendant confirmed that everything in the bag was his, Detective Holton told Agent Ramirez to ask Defendant, "Does he mind if we search the bag?" (Id. at 5). Agent Ramirez then said to Defendant, "If you give us permission [unintelligble] we might search the bag." (Id. at 5-6). Defendant said, "yes," and Agent Ramirez reported that Defendant gave his permission.

Detective Holton also told Agent Ramirez to tell Defendant that the dog was "interested in the picture frames," and to ask Defendant why the pictures were wrapped. In response to Agent Ramirez's statement that the dog alerted to the paintings, Defendant stated "mm-hmm," and in response to the question as to why they were in plastic, Defendant said, "Oh, just so they wouldn't

---

[8]According to Detective Holton, Agent Ramirez claims not to have heard Defendant mention an attorney and only discovered that he had done so after Agent Ramirez reviewed the tapes. Notwithstanding the fact that the Government indicated it expected to call Agent Ramirez at the evidentiary hearing and provided a copy of his corrections to the transcript (Docket No. 28), Agent Ramirez did not testify and so the Court has no basis on which to judge his credibility or demeanor.

get scratched up." Defendant also claimed that the pictures were of his sister and her husband. (Id. at 6).

Detective Holton next told Agent Ramirez to tell Defendant that if he did not want them to search the bag, he did not have to and it would be no problem, which Agent Ramirez translated into if "you don't want us to search your bag . . . we'll give it back to you." (Id.). Defendant was then asked whether, knowing that he could refuse, would he still "give us permission to look in your bag," to which Defendant responded "yes." (Id.).

Defendant was told that Detective Holton had worked drug cases for many years and that, in the past, he had seen drugs "in the paintings." (Id. at 7). When asked whether drugs would be found "there," Defendant said "I don't know . . . I don't know anything." (Id.). And, when reminded that he admitted that he packed the pictures, Defendant claimed he wrapped them so they would not be scratched and nothing would be found.

Detective Holton told Agent Ramirez to "one more time explain to him again . . . he does not have to let us search that," which Agent Ramirez translated to you "shouldn't let us search your bag. It's your right." (Id. at 7-8).[9] Agent Ramirez then said to Defendant you gave us "permission to look in your bags . . . to search and all like that . . . to go through them rather." (Id. at 8). Defendant responded "mm-hmm," Agent Ramirez said, you have a right to tell us no, and Defendant replied, "it wouldn't matter anyway, right?" (Id.).

Agent Ramirez told Defendant that if he refused, officers would have to follow a different process, they would have to "write an order" to present to the judge who would then "say" whether

---

[9] According to the Notice filed by the Government, Agent Ramirez, after reviewing the tapes, claims that he said "you don't have to" instead of "you shouldn't let us search your bag." (Docket No. 28 at 3).

there was cause for a search.  (Id. at 8-9).  Although Defendant's response to that statement is listed as unintelligible in the transcript, it appears that Defendant grunted and nodded, and Agent Ramirez told Detective Holton that Defendant said to "go ahead" and that "he's still okay with the searching."  (Id. at 9).

At this point, Defendant said, "Uh before everything else . . . will you be able to lend me a phone so I can call home?" to which Agent Ramirez said not to worry, they would get to it, and told Detective Holton that Defendant was still concerned about the phone call.  Defendant then continued with his request to use the phone by saying, "So that she [his wife] can be calling the attorney that I have."  (Id. at 9).  Again, Agent Ramirez assured Defendant that he would be allowed to make a phone call when the officers were finished.  And, again, Agent Ramirez did not tell Detective Holton anything about Defendant mentioning a lawyer.

The next several minutes of the interview were spent obtaining general background information from Defendant, including his hometown, wife's name, and citizenship status. Approximately 23½ minutes into the 25 minute interview, the following exchanged occurred:

> AGENT RAMIREZ:  OK.  Well, we have to go [UI] the judge.  Um . . . even though you [UI] gave us permission to look in your property, well look they've told us we need a judge's permission.  So we all of us have to go to present across from a judge, including you too.
> DEFENDANT: OK
> AGENT RAMIREZ: Ok? So we're going to go on up to Nashville.

(Id. at 13).

Defendant was handcuffed and driven to the federal building in Nashville.  He was placed in a holding room in the DEA office while Agent Holton went to speak with Assistant United States Attorneys ("AUSAs") Hugh McDonough and Brent Hanafan.

Agent Holton testified at the evidentiary hearing that he believed Defendant had consented

to the search of the picture frames while at the Sheriff's Department, but conceded that, had he known Defendant asked for counsel, he would have terminated the interview. Detective Holton also stated that Defendant was taken to Nashville because he (Detective Holton) believed that the frames might contain a large amount of drugs, the case might end up being brought by the federal government, and he thought it best to get advice from federal prosecutors.

Detective Holton told the AUSAs that Defendant had given consent on videotape and was given the green light to search the frames. He returned to the holding room and searched the frames in Defendant's presence.

Detective Holton began the search by taking the backing off and then poking a screwdriver into one of the frames. When he pulled the screwdriver out, Detective Holton found a white powder on the blade. The frames were then broken open, revealing a hollowed-out area that was lined with what appeared to be black carbon paper. Inside were aluminum foil packets containing a white crystal substance that turned out to be methamphetamine. Agents discovered approximately 1½ kilograms of methamphetamine in the frames.

After discovery of the drugs, Defendant was given his Miranda warnings and provided a Spanish translation of those rights. Defendant then stated that the methamphetamine was headed for a location several hours away. When asked who the drugs were going to, Agent Ramirez said that Defendant was requesting an attorney and, except for some biographical information for booking purposes, the interview stopped at that point.

Based upon the foregoing events, a grand jury returned a two-count Indictment against Defendant. He is charged with conspiring with others to possess and distribute 500 or more grams of methamphetamine (Count One), and with possessing with intent to distribute that quantity of

methamphetamine (Count Two).

## II. LEGAL DISCUSSION

In his Motion to Suppress, Defendant seeks to suppress the statements he made to officers as well as the methamphetamine that was found in the search of the frames on June 4, 2014. At the evidentiary hearing, however, the Government indicated that it would not seek to introduce any evidence about what Defendant said after he was given his Miranda warnings at the Sheriff's Office. Accordingly, the post-Miranda statements will be suppressed and the Court turns its attention to what is at the heart of this dispute – whether Defendant consented to the search and destruction of the frames in which the methamphetamine was secreted.

Generally, the Fourth Amendment to the United States Constitution prohibits warrantless searches and seizures. A well-recognized exception to the prohibition is a search conducted pursuant to consent, see Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973), and it is assorted nuances surrounding that exception which are at issue here.

First, a preliminary matter must be addressed. Defendant argues that the officers violated the Supreme Court's decision in Edwards v. Arizona, 451 U.S. 477 (1981), by asking him to consent to search after he had requested counsel. This Court disagrees.

Edwards held "that an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 484-85. Unfortunately for Defendant, Edwards' prohibition does not extend to a request for consent to search.

The Sixth Circuit has so held on at least two occasions. In United States v. Cooney, 26 F.

App'x 513 (6th Cir. 2002), the court stated that a request to consent after the invocation of the right to counsel does not violate the Fifth Amendment because "[t]he protections of [that] amendment only apply to incriminating evidence of a testimonial or communicative nature." Id. 523 (citing Schmerber v. California, 384 U.S. 757, 760-61 (1966)).  Nor does a request to search violate the Sixth Amendment because "a defendant's consent to search is not a critical state of the proceedings" and "a search does not generate evidence, but merely reveals evidence 'already in existence and virtually certain to be available to the government in due course.'" Id. at 523-24.  Later, the Sixth Circuit relied on Cooney in concluding officers did not act unlawfully by asking a motorist for permission to search his vehicle since the officers "could not have reasonably expected that their request would elicit anything more than a 'yes' or 'no,' which by itself would not have been an incriminating statement." United States v. Kellogg, 202 F. App'x 96, 103 (6th Cir. 2006).

Defendant is correct that both Cooney and Kellogg are unpublished decisions, and hence not controlling authority.  But even though such decision "are not binding precedent . . . , 'their reasoning may be instructive or helpful,' Crump v. Lafler, 657 F.3d 393, 405 (6th Cir. 2011), 'especially where there are no published decisions which will serve as well,' Hood v. Keller, 229 F. App'x 393, 398 n.5 (6th Cir.2007)." United States v. Stafford, 721 F.3d 380, 397 (6th Cir. 2013).  Moreover they are in keeping with the weight of appellate authority, both published and unpublished.  See, Flynn v. James,  513 F. App'x 37, 39 (2nd Cir. 2013) (citation omitted) (defendant's "invocation of his right to counsel, however, has no bearing on the validity of his consent because a request for consent to search is not an interrogation within the meaning of Miranda"); United States v. Knope, 655 F.3d 647, 654 (7th Cir. 2011) (defendant's argument based on Edwards "is foreclosed, however, by this court's holding that 'a consent to search is not an

interrogation within the meaning of <u>Miranda</u>,' <u>United States v. Shlater</u>, 85 F.3d 1251, 1256 (7th Cir. 1996)"); <u>United States v. Stevens</u>, 487 F.3d 232, 243 n. 3 (5th Cir. 2007) (collecting cases for the proposition that "statements of consent are not testimonial within the meaning of the Fifth Amendment"); <u>United States v. Gonzalez</u>, 1998 WL 377901, at *1 (4th Cir. July 1, 1998) ("a consent to search, however, is not an interrogation that triggers [defendant's] previously invoked right to counsel"); <u>United States v. Knight</u>, 58 F.3d 393, 397 (8th Cir. 1995) ("the Fifth Amendment's protection against self-incriminating statements may limit further interrogation once a person in custody invokes his right to counsel, but there is no similar prohibition on securing a voluntary consent to search for physical evidence").

Given the foregoing authority, the Court concludes that officers could, consistent with <u>Edwards</u>, ask Defendant for consent even though he asked to call a lawyer. This does not mean, however, that a request to contact counsel is entirely irrelevant to the question of whether consent is voluntary. After all, "'[v]oluntariness is determined by examining the totality of the circumstances, including the individual's age, intelligence, and education; whether the individual understands his right to refuse consent and his constitutional rights; the length and nature of the detention and whether the police used any coercive or punishing conduct, including 'subtle forms of coercion that might flaw an individual's judgment.'" <u>United States v. Collins</u>, 683 F.3d 697, 702 (6th Cir. 2012) (quoting, <u>United States v. Beauchamp</u>, 659 F.3d 560, 571 (6th Cir. 2011)). "To be valid, consent must be 'unequivocally, specifically, and intelligently given, uncontaminated by any duress or coercion.'" <u>United States v. Cochrane</u>, 702 F.3d 334, 342 (6th Cir. 2012) (quoting <u>United States v. Worley</u>, 193 F.3d 380, 386 (6th Cir. 1999)).

After full consideration, the Court cannot conclude that, under the totality of the

circumstances, Defendant specifically and unequivocally gave officers permission to search the frames or to destroy the frames in undertaking the search. This is particularly true when the Court considers (1) "[t]he government bears the burden of proving, through 'clear and positive testimony' that the consent to search was given voluntarily," Beauchamp, 659 F.3d at 570 (quoting United States v. Salvo, 133 F.3d 943, 953 (6th Cir.1998)), and (2) "[t]he scope of a search is generally defined by its expressed object," Florida v. Jimeno, 500 U.S. 248, 251 (1991).

Here, Defendant gave consent on at least five occasions. At the bus stop, he gave Deputy Davis permission to search his person and bag, and to unwrap the pictures from the frames. At the Sheriff's Office, Defendant gave Agent Ramirez and Detective Holton permission to search on four occasions. Yet, each and every time Defendant gave consent to Agent Ramirez and Detective Holton, it was in response to a request to search his bag; never once did those officers ask to search the picture frames, and Deputy Davis did not ask to search the frames because Defendant was "ready to pass out" and Detective Holton had told him they were going to get a warrant.

The Government argues that Defendant must have understood that they wanted to search the frames themselves because the requests were made the context of questioning surrounding Defendant's knowledge of what might be in the frames. Leaving aside that those very questions violated Edwards, the whole issue could have been obviated if the officers simply asked to search the frames,[10] instead of being coy or purposefully acting obtuse by asking to search the bag when, in fact, they wanted Defendant to consent to the search and destruction of the frames.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment

_____

[10] At one point, it appears that Detective Holton was set to ask whether officers could search the frames after telling Defendant that the dog had alerted on them but, for unexplained reasons, veered off into asking whether Defendant owned the frames and why the frames were wrapped in cellophane. He then returned to a direct request to search the bag, not the frames.

is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Jimeno, 500 U.S. at 250-51. Here, the typical reasonable person would understand that the officers meant exactly what they said; they wanted permission to search the bag. This understanding is confirmed by what transpired once the officers obtained Defendant's consent to search the bag – Defendant was told that they would go to Nashville to secure a warrant, which could only mean a warrant to search and, if necessary, destroy the frames.

In this regard, the Court recognizes, but rejects, Detective Holton's assertion that by asking for consent to search the bag, this included the picture frames. At the evidentiary hearing, Detective Holton explained that when he asks motorists to search their cars, he never specifically asks whether he can search the glove box, the trunk and under the seats. This analogy is only partially apt because "it is 'ordinarily' true that 'general consent [to a search] permits the opening of closed *but unlocked* containers found in the place as to which consent was given' even 'where officers did not tell the suspect the object of their search.'" United States v. Canipe, 569 F.3d 597, 605 (6th Cir. 2009) (emphasis added) (quoting United States v. Gant, 112 F.3d 239, 242 (6th Cir. 1997)).

Here, in contrast, officers did not look in a container in a car; rather, they broke open picture frames and in the process destroyed them. They did so even though they knowingly only asked to search Defendant's bag at a time when the picture frames were not even in the bag, but on top. "[W]hen an officer receives consent, he is allowed to search only what is reasonably covered by the consent given; '[i]t is very likely unreasonable to think that a suspect, by consenting to the search of his trunk [of his car], has agreed to the breaking open of a locked briefcase within the trunk, but it is otherwise with respect to a closed paper bag.'" United States v. Purcell, 526 F.3d 953, 962 (6th

Cir. 2008) (quoting <u>Jimeno</u>, 500 U.S. at 251); <u>see also</u>, <u>United States v. Garrido-Santana</u>, 360 F.3d 565, 576 (6th Cir. 2004) (citing <u>Jimeno</u> and stating in *dicta* that "[a] reasonable person likely would have understood his consent to exclude a search that would damage his property"); <u>United States v. Osage</u>, 235 F.3d 518, 521 (10th Cir. 2000) (noting that "Supreme Court and this court have previously stated that a general consent to search a particular area is reasonably understood to extend to a search of containers within that area that could contain contraband," but "we do not read that authority to permit the destruction of such containers"); <u>United States v. Torres</u>, 32 F.3d 225, 231-32 (7th Cir.1994) ("We agree that 'general permission to search does not include permission to inflict intentional damage to the places or things to be searched'"); <u>United States v. Ibarra</u>, 965 F.2d 1354, 1358-59 (5th Cir. 1992) ("It is obvious to us that citizens will have greater incentives to permit consensual searches of their property if they have some assurance that law enforcement officers will respect their premises while conducting such searches. The community's interest in encouraging consent would not be advanced by interpreting [defendant's] simple assent to the search of the house to include consent to break forcibly into the sealed attic space with a sledgehammer").

Continuing with the motor vehicle analogy, the Government cites <u>United States v. Strickland</u>, 902 F.3d 937, 942 (11th Cir. 1990), for the proposition that "a search of a vehicle conducted pursuant to probable cause may include any item and compartment in the car that might contain the object of the search," and "that 'such a search may include some injury to the vehicle or the items within the vehicle, if the damage is reasonably necessary to gain access to a specific location where the officers had probable cause to believe that the object of the search is located.'" (Docket No. 27 at 19-20, quoting <u>Strickland</u>, 902 F.3d at 942). However, <u>Strickland</u> must be read in context and in conjunction with its other holding.

Strickland dealt with a vehicle stop where consent to search a vehicle was given and escalated to the destruction of a spare tire after the officer developed probable cause to suspect the tire might contain contraband because "the spare had a rusty and bent rim, was made by a different manufacturer from the other four tires of the late model vehicle, seemed an incorrect size for the vehicle, was worn differently from the treads on the other tires, was extremely heavy for a spare tire, and contained something inside it that flopped around when the tire was moved." Id. at 942. The Eleventh Circuit began by recognizing that "[a] consensual search is confined to the terms of its authorization," and first held that

> a police officer could not reasonably interpret a general statement of consent to search an individual's vehicle to include the intentional infliction of damage to the vehicle or the property contained within it. Although an individual consenting to a vehicle search should expect that search to be thorough, he need not anticipate that the search will involve the destruction of his vehicle, its parts or contents. Indeed, it is difficult to conceive of any circumstance in which an individual would voluntarily consent to have the spare tire of their automobile slashed. Unless an individual specifically consents to police conduct that exceeds the reasonable bounds of a general statement of consent, that portion of the search is impermissible.

Id. at 941-42. Nevertheless, the court upheld the search because "there [was] another valid basis for justifying the intrusion," specifically the automobile exception to the warrant requirement. Id. at 942.

"The automobile exception allows officers to search a vehicle without a warrant if they have 'probable cause to believe that the vehicle contains evidence of a crime.'" United States v. Galaviz, 645 F.3d 347, 355 (6th Cir. 2011) (citation omitted). "This exception has traditionally been based on the 'ready mobility' of the automobile, which created 'an exigency sufficient to excuse failure to obtain a search warrant,'" but more "[r]ecent cases have clarified that the automobile exception need not rest on an independent showing of exigency, because '[e]ven in cases where an automobile was

not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception.'" Id. (citations omitted).

Here, of course, the automobile exception is not in play. "In the ordinary case, the [Supreme] Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." United States v. Place, 462 U.S. 696, 701 (1983). And, there is no basis for concluding any exigent circumstances existed because the frames were in the complete custody and control of agents in a federal building where four Magistrate Judges and five District Judges – who could have independently considered probable cause – have their chambers.

In its supplemental post-hearing brief, the Government argues that if Defendant did not consent, he should have taken the stand and so testified. The Government writes:

> [D]espite having the opportunity to testify before this Court on the scope of his consent, the defendant chose not to do so. He could have testified he did not understand the officers were asking for his consent to search the frames when they asked if they could search his "bag." He could have testified that he did not intend his consent to include the destruction of the frames. Instead, he chose to sit silent. The reason he sat silent is readily apparent. The defendant knew he couldn't have explained what it was that occurred on the day of his arrest that would have caused him to think the officers weren't asking if they could search the frames.

(Docket No. 42 at 6).

Leaving aside any potential self-incrimination issues under the Fifth Amendment, the short answer to this argument is that, as already explained, "the government had the burden of proving defendant's consent by clear and positive testimony." United States v. Hurst, 228 F.3d 751, 757 (6th Cir. 2000). It is not the Defendant's burden to establish the lack of consent or coercion. See, United States v. Harrison, 639 F.3d 1273, 1281 (10th Cir. 2011) ("We emphasize that it is not the

defendant's burden to prove that he was, in fact, coerced. Instead, the government bears the burden of showing that the defendant was not coerced.").

The Government argues that Defendant must have consented to a search and destruction of the picture frames because he voiced no objection when a screwdriver was driven into the frames and they were broken open in his presence. It is true "that a defendant's 'failure to object to the . . . search of [a particular area] may be considered an indication that the search was within the scope of the consent[.]'" <u>Osage</u>, 235 F.3d at 520 (citation omitted). "But any failure to object 'should not be treated as expanding a more limited consent, especially when the circumstances suggest some other possible reason for defendant's silence." <u>United States v. Cotton</u>, 722 F.3d 271, 277 (5th Cir. 2013); <u>see</u> <u>also</u> <u>United States v. Neely</u>, 564 F.3d 346, 351 (4th Cir. 2009) ("Because [defendant's] original consent did not physically encompass the interior of his vehicle, . . . we do not find his silence sufficiently persuasive to overcome the limitation he originally placed on the search); <u>United States v. Wald</u>, 216 F.3d 1222, 1228129 (10th Cir. 2000) (fact that defendant remained silent when scope of search went from passenger compartment to trunk did not amount to consent to search trunk where the failure to object stemmed from defendant's belief that he was under arrest and thus powerless to prevent the search).

Here, there were plenty of reasons why Defendant did not object to the officers tearing apart the frames. When the frames were torn apart, Defendant had already been in custody for at least a couple of hours, having first being confronted at the bus station where he exhibited signs of being scared and intimidated, then taken to the Sheriff's Department where he was interviewed despite requesting to call home for a lawyer, and then transported to Nashville. He had been advised that he had the right to remain silent and anything he said could be used against him, and it is entirely

plausible that he believed objecting to the frames being torn apart could be construed as an incriminating statement, something he had been reluctant to make up to that point in time. Most tellingly, when leaving the Sheriff's Office, he was told that he and the officers were going to Nashville to secure a warrant and so, when Detective Holton left the holding room and returned some time later, it was reasonable for Defendant to assume that officers had secured the warrant they said they were going to get.

Finally, the Government argues that even if Defendant did not consent to a search, the methamphetamine should not be suppressed because of the good faith exception articulated in United States v. Leon, 468 U.S. 897 (1984). The Court disagrees.

In Leon, the Supreme Court held that the exclusionary rule did not apply where police conducted a search in "objectively reasonable reliance" on a warrant that was later held to be invalid. Id. at 922. "The error in such a case rests with the issuing magistrate, not the police officer, and 'punish[ing] the errors of judges' is not the office of the exclusionary rule." Davis v United States, 131 S.Ct. 2419, 2428 (2011) (quoting Leon, 468 U.S. at 916). The Supreme Court's "range of cases" applying Leon's good faith exception "have sounded a similar theme" id., such as applying Leon to searches conducted in reliance on subsequently invalidated statutes, Illinois v. Krull, 480 U.S. 340 (1987); to police reasonably relying on erroneous information in a database maintained by judicial employees, Arizona v. Evans, 514 U.S. 1 (1995) or police employees, Herring v. United States, 555 U.S. 134 (2009); and to a search based upon binding appellate precedent that was later overturned, Davis, 131 S.Ct. 2419. "Indeed, in 27 years of practice under Leon's good faith exception, [the Court] ha[s] 'never applied' the exclusionary rule to suppress nonculpable, innocent police conduct." Davis, 131 S.Ct. at 2419; see also, United States v. Herrera, 444 F.3d 1238, 1250

(10th Cir. 2006) ("application of <u>Leon</u>'s good faith exception to the exclusionary rule turns to a great extent on whose mistake produces the Fourth Amendment violation" and "[t]he Supreme Court has never extended <u>Leon</u>'s good faith exception beyond circumstances where an officer has relied in good faith on a mistake by someone other than the police").

Here, in contrast, the culpable conduct was that of Detective Holton and Agent Ramirez. It was not innocent. Rather, either knowingly, or through reckless indifference or gross negligence, officers decided to search and destroy an item over which they never even sought to obtain consent to search. They did so after violating <u>Edwards</u> by making accusatory statements and asking incriminating questions (although no blame for that can be placed on Detective Holton), and by deliberately refraining from asking the simple question necessary to conduct the destructive search they intended. And, they did so after twice verbally recognizing that a warrant might well be necessary.

### III. <u>CONCLUSION</u>

Defendant's Motion to Suppress ultimately turns on the burden of proof. Because the Government has not presented clear and positive proof that Defendant consented to a search of the picture frames, let alone that he consented to their destruction, his Motion to Suppress will be granted.

The Court does not undertake the suppression of evidence lightly, particularly since the exclusion of evidence "exacts a heavy toll on both the judicial system and society at large," with the "bottom-line effect, in many cases, [being] to supress the truth and set the criminal loose in the community without punishment." <u>Davis</u>, 131 S.Ct. at 2327. However, it is fundamental "that searches conducted outside the judicial process, without prior approval by judge or magistrate, are

*per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." <u>Arizona v. Gant</u>, 556 U.S. 332, 338 (2009).  The record simply does not warrant the conclusion that officers obtained unequivocal, specific and intelligent consent from Defendant to search anything other than the bag.

An appropriate Order will be entered.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE